**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

RONALD SWINTEK,

      Plaintiff,

v.

THOMAS J. DART in his official capacity as
Sheriff of Cook County, Illinois; THE COOK
COUNTY SHERIFF'S MERIT BOARD; and
COOK COUNTY, ILLINOIS, as indemnitor.

      Defendants.

Case Number 21-cv-03079

Hon. Judge LaShonda A Hunt
Mag. Judge Sunil Harjani

JURY TRIAL DEMANDED

**DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 1

   I.    Swintek's Employment as a Correctional Officer .................................... 2

   II.   Swintek Makes Extremist and Bigoted Posts Denigrating Islam and its Adherents 2

   III.   Investigator Hernandez Discovers Ivan Stalin Account ....................................... 4

   IV.   Barker Conducts Investigation Into Swintek's Extremist Posts and False Report of Injury ................................................................................................... 5

   V.   Barker Authored Investigative Reports Sustaining a Finding of Multiple Violations of Sherriff's Policies ...................................................................................... 6

   VI.   Merit Board Sustains Swintek's Termination ..................................... 8

   VII.   Procedural History ............................................................................. 10

STANDARD OF REVIEW ................................................................................. 10

LEGAL ARGUMENT ........................................................................................ 11

   VIII.   Swintek's Speech Was Not Constitutionally Protected ..................... 12

     A.   Each of the Pickering Factors Favor Upholding The CCSO's Off-Duty Anti-Discriminatory Speech Policy ........................................................... 15

   IX.   Merit Board's Findings Regarding Secondary Violation of Policy of Failing to Provide Medical Records Provides Additional Basis to Affirm The Decision to Terminate ................................................................................................ 19

CONCLUSION ................................................................................................. 21

# TABLE OF CASES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)............................................ 11

*Campbell v. Towse*, 99 F.3d 820, 830 (7th Cir. 1996).................................................... 12

*Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). ................................................... 11

*Caruso v. De Luca*, 81 F.3d 666, 670 (7th Cir. 1996)................................................... 16

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).................................................... 10

*City of San Diego v. Roe*, 543 US. 77, 80 (2004) ....................................................... 11

*City of San Diego, Cal. v. Roe*, 543 U.S. 77, 81 (2004)............................................... 14

*Connick v. Myers*, 461 U.S. 138, 153 (1983)............................................................... 18

*Craig v. Rich Twp. High Sch. Dist.* 227, 736 F.3d 1110, 1119 (7th Cir. 2013).............. 17

*Cruz v. Cook Cnty. Sheriff's Merit Bd.*, 394 Ill. App. 3d 337, 34342 (2009) .................. 20

*Curran v. Cousins*, 509 F.3d 36, 50 (1st Cir. 2007) .................................................... 12

*Doggrell v. City of Anniston, Alabama*, 277 F. Supp. 3d 1239, 1259 (N.D. Ala.
    2017). ................................................................................................... 14, 16

*Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994) ......................................... 17

*Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845,849 (7th Cir. 2010) ............. 11

*Graber v. Clarke*, 763 F.3d 888, 897–98 (7th Cir. 2014) .............................................. 12

*Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 899 (7th Cir. 1999) ............... 14

*Gross v. Town of Cicero*, 11L, 619 F .3d 697, 704 (7th Cir. 2010) ................................ 11

*Harnishfeger v. Kopczynski*, No. 116CV03035TWPDLP, 2022 WL 911491, at *11
    (S.D. Ind. Mar. 29, 2022) ......................................................................... 18

*Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999) .............................................. 12

*Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 796 (7th Cir. 2016) .............................. 12

*Locurto v. Giuliani*, 447 F.3d 159, 177 (2d Cir. 2006).................................................. 13

*Milliman v. Cnty. of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018)................................. 20

*Moore v. City of Wynnewood*, 57 F.3d 924, 934 (10th Cir.1995)................................... 12

*Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000) ...................... 12

*Pappas v. Giuliani*, 290 F.3d 143, 144–45 (2d Cir. 2002)............................................... 13

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968) ........................................................................................................... 12

*Schneiter v. Carr*, No. 21-CV-135 JDP, 2022 WL 1773484, at *6 (W.D. Wis. June 1, 2022) ......................................................................................................................... 17

*Shreffler v. City of Kankakee,* No. 19-CV-2170, 2021 WL 6200764, at *27 (C.D. Ill. Sept. 28, 2021) ........................................................................................................... 17

*Shreffler v. City of Kankakee*, No. 19-CV-2170, 2021 WL 6200764, at *27 (C.D. Ill. Sept. 28, 2021); ......................................................................................................... 17

*Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003)........................................................... 11

*Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) ...................... 10

*Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013)................................................. 12

*Terry v. Cook*, 866 F.2d 373 (11th Cir.1989)................................................................. 17

*Tindle v. Caudell*, 56 F.3d 966, 971 (8th Cir. 1995)....................................................... 13

*Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014)............................ 11

*Upton v. Thompson*, 930 F.2d 1209, 1215 (7th Cir. 1991). .......................................... 16

*Volkman v. Ryker*, 736 F.3d 1084, 1092 (7th Cir. 2013) .............................................. 16

**INTRODUCTION**

Plaintiff Ronald Swintek was terminated from his position as a correctional officer with the Cook County Sheriff's Office following an investigation and subsequent Merit Board Proceedings. These proceedings confirmed that he posted highly offensive comments about Muslims on his Facebook account and refused to provide his medical records after falling on duty immediately after he became aware of the investigation into his misconduct. Swintek asserts that Defendants violated his First Amendment rights. However, Swintek's claims fail as a matter of law because the offensive Facebook posts in question were not protected by the First Amendment. This is due to the fact that his comments espousing violence against a minority group, comments he posted did not address matters of public concern. Moreover, even if Swintek could establish that the bigoted posts he authored did touch on issues of public concern, the Sheriff's interests in maintaining harmony among co-workers in a law enforcement agency and mitigating the impact of such offensive posts on public confidence in law enforcement materially outweigh any theoretical interest Swintek might have had in expressing his bigoted views. For these reasons, the Defendants respectfully request that the Court grant Summary Judgment in their favor.

**STATEMENT OF FACTS**

The facts upon which Defendants rely in this Memorandum of Law in support of its Motion are in Defendant's Local Rule 56.1(a)(3) ("LR 56.1") statement of uncontested facts.

## I. Swintek's Employment as a Correctional Officer

Swintek was a correctional officer employed by the Cook County Department of Corrections ("CCSO"). Swintek was first hired by the Cook County Sherriff's Department as a Correctional Officer on April 26, 1993. (SUF 7). Swintek took several injury on duty leaves between 2010 to 2017, but had returned to duty several times in between that timeframe (SUF 8). As a correctional officer, Swintek occupied a trusted position in the community. (SUF 10-12). Swintek understood that he was subject to certain standards of conduct even while off duty by virtue of his position. (SUF 13).

## II. Swintek Makes Extremist and Bigoted Posts Denigrating Islam and its Adherents

Swintek has maintained a Facebook account using the pseudonym Ivan Stalin for several years. (SUF 14). Between 2010 and 2017 Swintek made postings on the Ivan Stalin account. (SUF 15). The Ivan Stalin Account had between 500 and 1000 followers/friends. (SUF 16). Hundreds of these accounts were of other CCSO officers. (SUF 17). Swintek did not know that he could change privacy settings to select who could and could not see his Facebook posts. (SUF 18).

In one post on the Ivan Stalin account Swintek referred to the Prophet Mohammed as a "bitch." (SUF 19).[1]

Swintek wrote in another post on the Ivan Stalin account referring to individuals in a video who appeared to be Muslim as "raghead, goat fucking piece of shit." (SUF 21).[2]

---

[1] Swintek was not able to recall the precise date of the post.
[2] Swintek did not remember when this post was made.

On or around September 17, 2016, Swintek authored a post on the Ivan Stalin account that stated "God bless Israel. Maybe [sic] they continue to kill muslims this worlds real enemy." (SUF 22).

Swintek also made a post on the Ivan Stalin account stating, "[t]hank God we have a president that is worried about American [sic] And Americans. That Will fight to protect us from filthy muslims." (SUF 23).[3]

In another post on the Ivan Stalin account, Swintek wrote that he believed Muslims could not be trusted because he believed that the Quran called for "nonbelievers" to be put to death. (SUF 25).[4]

In another post on the Ivan Stalin account, Swintek wrote that "I give no one permission to copy or use any of my posts in any way or form. Freshly cooked County sheriffs please. And or OPR" (SUF 26).[5]

On June 7 (year unknown) Swintek posted "Fuck you rag head" alongside an online article. (SUF 27). Swintek understood that use of the term "raghead" is a slanderous term. (SUF 28).

On August 11,2016, Swintek posted the following on the Ivan Stalin account:

When are people going to understand Moslems are not part of America. They do not want to be part of America their only goal is to destroy and conquer America. And the only reason that is it because we will not bow down to Ali Baba and his pedophile Mohammed. Muslims are here to kill

---

[3] Swintek did not remember when this post was made but the post states the month January, which reflects that the post was made in January 2017.
[4] Swintek did not remember when this post was made.
[5] Swintek did not remember when this post was made.

you and your family that's it. It says in the Karana you either must except

Allah as your Savior and God or die. That's pretty straightforward for me.

Oh but I forgot Obama and the Democrats. Say they don't mean it. Just ask

the millions of dead Christians and Hindus and Jews that they have killed

around the world if they mean it or not!!

(SUF 29). Swintek understood Ali Baba to be the "prince of thieves". (SUF 30).

On September 11, 2016, Swintek posted "I swear to God I will never bend to my knees for Allah. Or his bitch Mohammed." (SUF 31).

On November 2, 2016, Swintek posted on the Ivan Stalin account "Ronald Swintek for president write my name in." (SUF 32).

In another post, Swintek wrote, "Dear liberal Democrats I say no to Islam no and forever. You can not make me worship him or his bitch Mohammed." (SUF 33).[6]

Swintek posted a photo of himself on the Ivan Stalin page. (SUF 34). In this photo Swintek wore a hat with a star that resembled one of the logos used by the CCSO. (SUF 34).

On February 3, 2017, Swintek received an email on his Sheriff's email account stating that he could view the February 2, 2017 version of Policy 1029, the Sheriff's social media policy, on the CCSO's intranet. (SUF 37). However, Swintek never removed any of the above mentioned posts from the Ivan Stalin account. (SUF 38).

### III.   Investigator Hernandez Discovers Ivan Stalin Account

Felix Hernandez is the officer who first reported that Swintek was using the Facebook account of "Ivan Stalin". (SUF 39). Hernandez was assigned to complete

---

[6] Swintek did not remember when this post was made.

preliminary investigative work and review grievances for the Sheriff's Department. (SUF 40). On July 27, 2017, Hernandez noticed the Ivan Stalin account contained posts denigrating the Muslim religion and communicating anti-Muslim propaganda. (SUF 41). Hernandez surmised that he first saw Ivan Stalin's account due to having connections in common with Ivan Stalin. (SUF 42). Hernandez did not initially know who owned the Ivan Stalin account. (SUF 42). On review of the account, he found two posts referencing Swintek, one which referenced Swintek's name and one that contained a photo of Swintek. (SUF 43). Hernandez worked with investigator Eyman Zabadneh and asked if Zabadneh agreed that the posts warranted an investigation. (SUF 44). Zabadneh found the posts to be extremely offensive and reflected poorly on the CCSO due to Swintek's affiliation as a Correctional Officer. (SUF 45). Hernandez reported Swintek's conduct to the director in the Office of Professional Review (OPR). (SUF 46). On September 27, 2017, the Director of OPR submitted a formal complaint against Swintek regarding the above social media posts. (SUF 47).

## IV. Barker Conducts Investigation Into Swintek's Extremist Posts and False Report of Injury

Barker is an investigator for the Sheriff's OPR. (SUF 48). Barker investigated the report against Swintek regarding posts made under the pseudonym "Ivan Stalin". (SUF 49). Barker determined that Swintek was the author of the Ivan Stalin account due to the fact that Swintek posted his name and a photo of himself. (SUF 50).

Barker emailed Switek on September 27, 2017 to schedule an investigatory interview regarding the postings on the Ivan Stalin account. (SUF 51). The next day, after

responding to Barker's email, Swintek claimed that he fell and sustained an on the job injury. (SUF 52).

After the fall Swintek was asked to execute a document to release his medical records to the Sherriff. (SUF 52). However, Swintek initially declined to turn over his medical records. (SUF 53). Due to the suspicious circumstances surrounding Swintek's alleged injury on duty just moments after he learned of the OPR investigation, Barker initiated another investigation to specifically review the facts surrounding Swintek's alleged injury. (SUF 54).

## V. Barker Authored Investigative Reports Sustaining a Finding of Multiple Violations of Sherriff's Policies

Based on Barker's investigation, Barker sustained the complaint made against Swintek. (SUF 55). On February 21, 2018, Barker completed a report that stated:

This investigation was initiated on July 27, 2017, Director Cameron Pon submitted a complaint register stating Correctional Officer (CO) Ronald Swintek has been using social media to discriminate and make hateful and disparaging/discrediting comments/statements against the Muslim religion. This investigation revealed sufficient evidence to verify that CO Swintek portrayed conduct unbecoming of an officer of the Cook County Sheriffs Office. He posted inappropriate comments and pictures disrespecting the Muslim faith. The Facebook page of "Ivan Stalin" was verified to be CO Ronald Swintek from a photograph in CCSO uniform and OPR was able to positively identify CO Ronald Swintek. There was also another post that stated "Ronald Swintek for president write my name in." . . . When CO

Swintek fell in the Cook County Department of Corrections - Warehouse, he refused to sign medical release documents, which did not allow OPR the opportunity to retrieve his medical documents. Also it was alleged that CO Swintek faked his fall in the Warehouse. A complaint register was completed by Director Michele Morris, see OPR2017-037

(SUF 56). Barker found that the posts on the Ivan Stalin account violated the "General Orders and Policies" of the Cook County Sheriff's Department, specifically Policy 11.2.20.1 VI-B (k) which prohibits "Discourteous, disrespectful or discriminatory treatment of any member of the public or any member of the CCSO."; Policy 11.2.20.1 VI-B(l) which prohibits "Inappropriate language or gestures directed at any person that are abusive, harassing, or insolent."; Policy 11.2.20.1 VI-C which prohibits an officer from engaging in acts that "Discriminate against, harass or intimidate any person because of age, ancestry, citizenship status, color, disability, ethnicity, gender identity, genetic information, marital status, medical condition, military service, national origin, order of protection status, parental status, political affiliation, pregnancy, race. religion, sex, sexual orientation, or other classifications protected by law."; Policy 11.2.20.1 VI-E(6) which prohibits "Disobedience or insubordination to constituted authorities, including refusal or deliberate failure to carry out or follow lawful directives and orders from any supervisor or person in a position of authority."; as well as Article X Paragraph B of the Merit Board's Rules and Regulations. (SUF 57). Barker also opined that the speech could negatively impact the morale within the Sheriff's department especially amongst members who are Muslim. (SUF 58).

Barker also found that Swintek's refusal to sign medical release forms on September 28, 2017, related to his workers' compensation injury constituted a violation of the Conduct Policy of the Sheriff's Department, specifically Sheriff's Order 11.2.20.1 Section VI-E 29 and 30, which required an employee to authorize release of medical data. (SUF 59). Barker also determined that Swintek's injury was exaggerated. (SUF 60).

Barker submitted his reports to OPR Assistant Director Miriam Rentas. (SUF 61). On May 17, 2018, CCSO Chief Operating Officer Bradley Curry reviewed Barker's investigation and signed a Command Channel Review Determination Form to initiate Swintek's termination proceedings with the Merit Board in connection with Barker's findings of fact related to the Ivan Stalin account. (SUF 62). On December 27, 2018, Curry signed an additional Command Channel Review Determination Form to initiate Swintek's termination proceedings with the Merit Board in connection with Barker's findings of fact related to the potentially false report of injury. (SUF 63).

## VI. Merit Board Sustains Swintek's Termination

On August 1, 2018, counsel for the Sheriff filed a disciplinary complaint before the Merit Board against Plaintiff. (SUF 66). The complaint reflected that Swintek posted disrespectful and inappropriate comments on Facebook denigrating the Muslim faith and its adherents under the moniker "Ivan Stalin" and engaged in other conduct unbecoming of an officer related to his alleged fall. (SUF 67).

On October 22, 2019, January 9, 2020, January 16, 2020, March 5, 2020, June 22, 2020, July 15, 2020, October 22, 2020, and November 19, 2020, the Merit Board held evidentiary hearings, with Board member Byron Brazier ("Brazier") serving as the hearing officer. (SUF 68).

Although Swintek professed regret for having made the above comments on Facebook, he did not ever issue an apology to the Merit Board for making the posts. (SUF 71). Swintek never informed any investigator or testified to the Merit Board that the posts did not reflect his genuine beliefs. (SUF 72).

On January 21, 2021, the Merit Board issued a decision approving Swintek's termination. (SUF 73).

The Merit Board found that Swintek violated Policy 1029 and 11.2.20.1 of the Policy Manual and the Merit Board's Rules and Regulations including but not limited to Article X Paragraph B of the "General Orders and Policies" of the Cook County Sheriff's Department. (SUF 74). The Merit Board specifically found that "[t]he policy clearly states that it does not matter if he is on duty or off duty when he committed these acts and these violations." (SUF 74). Policy 1029 specifically governs' Sheriff's officer's social media speech, both on and off duty where it is "significantly linked to, or related to, the Sheriff's Office and tends to compromise or damage the mission, function, reputation or professionalism of the Sheriff's Office or its members". (SUF 75). The Merit Board also found that Swintek's initial refusal to execute the release of medical records violated SHERIFF'S ORDER 11.2.20.1 Section VI-E 29 &30.[7] (SUF 76).

The Merit Board ordered that Swintek should be effective August 1, 2018. (SUF 77).

---

[7] "29. Failure to disclose or misrepresenting facts, or the making of any false or misleading statement on any application, examination form or other official document, report or form, or during the course of any work related investigation. 30. Giving any false or misleading statement, or misrepresenting or omitting material information, to a supervisor or other person in a position of authority in connection with any investigation or in the reporting of any CCSO related business."

## VII.  Procedural History

On February 25, 2021, Plaintiff filed a Complaint in the Circuit Court of Cook County Illinois for administrative review pursuant to Illinois' Administrative Review Law. On May 10, 2021, Plaintiff filed a First Amended Complaint and pled a second cause of action alleging violation of Plaintiff's first amendment rights pursuant to 42 USC § 1983 and a third cause of action for discrimination in violation of the Americans with Disabilities Act (ADA). On June 4, 2021, Plaintiff filed a Second Amended Complaint. Defendants Dart and Cook County timely filed a notice of removal on June 8, 2022. Dkt. 1. The Court granted Defendants' partial motion to dismiss Plaintiff's ADA claim pursuant to FRCP 12(b)(6) on January 3, 2022. Plaintiff's claim based on the Illinois' Administrative Review Law has been fully briefed since August 4, 2022.[8] Plaintiff filed a Third Amended Complaint ("TAC") on October 4, 2023 to correct a typo, no new claims were added to the TAC.

## STANDARD OF REVIEW

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

---

[8] The parties are awaiting a determination as to the administrative review claim, Count I of the TAC. Defendants respectfully request that the Court find in favor of Defendants as to Count I for the reasons explained in their previous briefing. This motion for Summary Judgment is focused on why the Court should grant Summary Judgment on the remaining claim, Count II of Plaintiff's TAC.

*See Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). Where the moving party demonstrates the absence of a disputed issue of material fact, the non-moving party bears the burden of presenting "evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).

Along with its motion for summary judgment, Defendants have filed their statement of uncontested material facts pursuant to Local Rule 56.1, as required by Local Rule 56.2. This Notice explains the requirements of the Local Rules and warns Plaintiff that his failure to controvert the facts as set forth in Defendant's 56.1 statement of uncontested facts will result in those facts being deemed admitted. *See, e.g., Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

## **LEGAL ARGUMENT**

A section 1983 First Amendment retaliation Claim requires the Court to engage in a three-step analysis to determine: (1) whether the speech was constitutionally protected; (2) whether the protected speech was a but-for cause of the challenged employment action; and (3) whether the employee suffered a deprivation because of the employment action. See *Gross v. Town of Cicero*, 11L, 619 F .3d 697, 704 (7th Cir. 2010). "[A] governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *City of San Diego v. Roe*, 543 US. 77, 80 (2004).

**VIII.    Swintek's Speech Was Not Constitutionally Protected**

Swintek mistakenly believes that Facebook posts he authored on the Ivan Stalin account consisted of speech protected under the First Amendment. For a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in "promoting effective and efficient public service." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (finding that employee's speech was not protected). This third element is known as the *Pickering* balancing test. *Id.* at 827 (citing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968)).

A majority or circuits, including this one, have found that law enforcement agencies, in particular, are to be afforded deference when analyzing restrictions on speech. *Campbell v. Towse*, 99 F.3d 820, 830 (7th Cir. 1996) ("need for discipline, personal loyalty and harmony among co-workers is 'particularly acute' in context of law enforcement") citing *Moore v. City of Wynnewood*, 57 F.3d 924, 934 (10th Cir.1995); *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 796 (7th Cir. 2016); *Graber v. Clarke*, 763 F.3d 888, 897–98 (7th Cir. 2014); *Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999); *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000) ("In a law enforcement agency, there is a heightened need for order, loyalty, morale and harmony, which affords a police department more latitude in responding to the speech of its officers than other government employers"); *Curran v. Cousins*, 509 F.3d 36, 50 (1st Cir. 2007).

Under these facts, the threshold questions are whether Swintek made the posts in question as a private citizen and whether the posts addressed a matter of public concern. Although there is no evidence that Swintek made the posts while he was on duty, Swintek was continuously employed by the CCSO throughout the time period that he made the posts identified above. (SUF 8). Further, there is no question that Swintek was subject to the CCSO's various policies governing off duty conduct that is discriminatory or reflects poorly on the CCSO during the time period that he made the posts in question. (SUF 13, 57, 59, 74, 75).

Regardless of whether Swintek made the posts as a private citizen while espousing his beliefs to friends of friends and other members of the CCSO, he cannot show that his speech touched on a matter of public concern.

Courts routinely find that a governmental employee's bigoted off-duty speech does not touch on any matter of public concern; this is particularly true of law enforcement employees. *Locurto v. Giuliani*, 447 F.3d 159, 177 (2d Cir. 2006) (reversing judgment for the plaintiffs where "the evidence in the record is overwhelming that, in discharging the plaintiffs, the defendants were motivated primarily by a concern that the public, and particularly members of minority communities, would regard the NYPD and FDNY as racist"); *Pappas v. Giuliani*, 290 F.3d 143, 144–45 (2d Cir. 2002) (holding that the plaintiff's right to anonymously distribute "offensive racially bigoted materials" was outweighed by his employer's interest "in promoting the efficiency of the public service it performs"); *Tindle v. Caudell*, 56 F.3d 966, 971 (8th Cir. 1995) (finding that because the plaintiff "has not met his burden of showing that his appearance at [a] party [wearing

blackface] expressed a matter of public concern, it is not really necessary to move on to the Pickering balancing test.").

Comments made by a law enforcement professional, espousing violence against a minority group, do not legitimately touch on matters of public concern. See *Doggrell v. City of Anniston, Alabama*, 277 F. Supp. 3d 1239, 1259 (N.D. Ala. 2017) (finding officer's bigoted speech was not protected speech). Swintek's offensive posts did nothing to inform the public of any aspect of a policy debate. These posts did, however, violate several of the Sheriff's policies and reflected that Swintek should not be trusted with the authority inherent as a member of the Sheriff's department to protect the community. Moreover, Swintek admitted in his deposition that "I thought my speech was all protected by the First Amendment and other amendments. Then I found out afterwards that you really can't say things like that." (SUF 36).

This case has similarities to the *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 81 (2004). In the *City of San Diego* case an officer made several home-made, sexually explicit videos for sale on an online auction site. The officer was terminated and asserted a 1983 claim for infringement of first amendment rights. The Court upheld the termination. Critical to the Court's analysis was the fact that the officer had donned his uniform in parts of the video. The Court found that "[t]he [employee's] use of the uniform, . . . brought the mission of the employer and the professionalism of its officers into serious disrepute." Here, like in *City of San Diego*, Defendants believed, based on the evidence presented during the hearings, that Swintek wore a hat with a CCSO emblem on it. (*Green v. Nat'l Steel Corp., Midwest Div*., 197 F.3d 894, 899 (7th Cir. 1999) ["regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will

not second-guess its decisions."]). Swintek also identified himself by name on the Facebook account. Based on the evidence presented to Defendants at the Merit Board proceeding, it appeared Swintek linked his posts to the Cook County Department of Corrections in a way that seriously threatened the mission of the Sheriff's department to instill confidence in law enforcement. Especially in a post George Floyd world, and in a time where many law enforcement agencies are fighting to maintain their reputation in the face of public criticism, the Sherriff's Department should not have to wait for Swintek to violate an inmate's civil rights when he has published comments promoting violence against Muslims, and unequivocally deemed them "the worlds real enemy". If Swintek were allowed to remain on the job it would seriously damage the reputation of the Sheriff for tolerating such bigotry.

Moreover, even assuming, *arguendo*, that Swintek could establish that his posts touched on a matter of public concern, as explained below, the Defendants' interests in "promoting effective and efficient public service" under the *Pickering* balancing test significantly outweigh any potential First Amendment rights Swintek theoretically could have in connection to speech that promotes racial and religious bigotry and violence.

### A. Each of the Pickering Factors Favor Upholding The CCSO's Off-Duty Anti-Discriminatory Speech Policy

In this Circuit, courts are instructed to examine the following factors in evaluating whether the *Pickering* factors favor the employer's restraints on speech:

(1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence

are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Caruso v. De Luca*, 81 F.3d 666, 670 (7th Cir. 1996). Generally speaking, the "first, second, third and fifth factors" will weigh in favor of a law enforcement agency. *Volkman v. Ryker*, 736 F.3d 1084, 1092 (7th Cir. 2013)

Here, the first *Pickering* factor weighs in Defendants' favor. The CCSO, as a law enforcement agency, has a heightened interest in maintaining harmony amongst its co-workers. *See, e.g., Doggrell v. City of Anniston, Alabama*, 277 F. Supp. 3d 1239, 1259 (N.D. Ala. 2017). If Swintek was allowed to remain employed, Muslim and other members of the CCSO would take issue with the fact that a person espousing such offensive views of their religion is tolerated within their ranks. This is not simply theoretical, the officers who reviewed Swintek's speech In OPR found the posts to be highly offensive. (SUF 44-45).

The second *Pickering* factor also weighs in Defendants' favor. It is well established that public confidence in law enforcement is critical to the Sheriff's law enforcement mission, "[i]n order to promote public confidence in law enforcement, the Sheriff depends on his deputies to publicly project his competence and the competence of the office." *See, e.g.*, *Upton v. Thompson*, 930 F.2d 1209, 1215 (7th Cir. 1991). Thus, personal loyalty and confidence are critical in law enforcement. *Id*. at 1217 (*citing Terry v. Cook*, 866 F.2d 373

(11th Cir.1989)). Here, Swintek's promotion of violence against a minority group, in and of itself, would erode confidence about Swintek's loyalties to other officers, especially those who identify as Muslim.

For the third *Pickering* factor, whether the speech impeded the employee's ability to perform the employee's daily responsibilities, it is not necessary that the speech directly impede day to day responsibilities. *Craig v. Rich Twp. High Sch. Dist*. 227, 736 F.3d 1110, 1119 (7th Cir. 2013) (finding that a government employer may contemplate both the actual and potential disruptions that the speech may cause based on the government employer's "reasonable predictions of disruption."). In this case, the offensive posts had a potential negative impact on morale if the CCSO were to take no action. Additionally, Swintek's bigoted "speech directly conflicted with his responsibility as a [law enforcement] officer to foster a relationship of trust and respect with the public." *Shreffler v. City of Kankakee*, No. 19-CV-2170, 2021 WL 6200764, at *27 (C.D. Ill. Sept. 28, 2021); *Schneiter v. Carr*, No. 21-CV-135-JDP, 2022 WL 1773484, at *6 (W.D. Wis. June 1, 2022) ("It was reasonable for defendants to conclude that an employee who had expressed such disdain for so many groups of people could no longer be effective in his job."). Thus, the third Pickering factor weighs in Defendants' favor.

The fourth *Pickering* factor, the time, place, and manner of the speech, weighs in Defendants favor because Swintek's posts "imparted no new information about the issues to public discourse other than his own unsubstantiated [views]." *Shreffler v. City of Kankakee,* No. 19-CV-2170, 2021 WL 6200764, at *27 (C.D. Ill. Sept. 28, 2021), *reconsideration denied*, No. 19-CV-2170, 2021 WL 6200763 (C.D. Ill. Nov. 29, 2021); *see also Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir. 1994) ("The less serious,

portentous, political, significant the genre of expression, the less imposing the justification that the government must put forth in order to be permitted to suppress the expression."). There was no genuine debate at issue in Swintek's posts. Swintek's posts merely reflect his own personal hate inspired views and do not provide any meaningful information about a matter of public interest. Rather, Swintek's posts forward disinformation about a major world religion and its adherents. The fact that the speech was posted online and was accessible to hundreds of other members of CCSO, like Felix Hernandez, who were mere acquaintances with Swintek, also supports Defendants' position as to the fourth *Pickering* factor. (SUF 42).

The fifth factor of the *Pickering* test, the context in which the underlying dispute arose, is not applicable here as the speech did not address any issue related to policy decision-making within the CCSO. See *Connick v. Myers*, 461 U.S. 138, 153 (1983) ("When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office."); *see also Harnishfeger v. Kopczynski*, No. 116CV03035TWPDLP, 2022 WL 911491, at *11 (S.D. Ind. Mar. 29, 2022) (the fifth *Pickering* factor "has a specific purpose related to ongoing disputes in the competing employee-speech interests and employer-efficiency interest context").

Similar to the fourth factor, the sixth *Pickering* factor, whether the matter was one on which debate was vital to informed decision making, heavily weighs in Defendants' favor. Several of the offending posts consisted of hate based slurs and contained no discussion of debatable issues. Nowhere does Swintek make statements expressing

opinions related to reasoned policy debate. Moreover, Swintek's attempts to articulate what aspect of his speech touched on political  debate are incoherent, as evidenced by this direct quote of Swintek attempting to explain the meaning behind his comment: "Thank God we have a president that is worried about American. And Americans.  That Will fight to protect us from filthy muslims." Swintek stated his intent behind this message was to communicate: "that the Lord Savior and Donald Trump would help to protect us." (SUF 24). When asked whether removal of the phrase "filthy Muslims" from the post would have conveyed support for Mr. Trump Swintek responded, "No, I don't think so." (SUF 24). Swintek's responses in connection to this post highlights his flippant view of the situation and general lack of remorse. In other posts Swintek proclaimed Muslims to be the worlds' "real enemy", praised Israel for killing Muslims, and referred to Muslim individuals as "rag heads".  (SUF 22, 27, 28).

Finally, as to the last *Pickering* factor, Swintek should not be regarded as merely a member of the general public. The Merit Board found that the evidence supported the CCSO's belief that he was wearing a hat with the CCSO logo on the Ivan Stalin page. Thus, attempting to tie his authority as a member of the CCSO to his hate inspired speech.

For these reasons, Swintek's posts on the Ivan Stalin account were not protected by the First Amendment.

### IX. Merit Board's Findings Regarding Secondary Violation of Policy of Failing to Provide Medical Records Provides Additional Basis to Affirm The Decision to Terminate

In addition to failure to establish that some of his speech could have been constitutionally protected, Swintek is also required to establish that his "protected speech

was a but-for cause of the employer's action." *Milliman v. Cnty. of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018). Swintek cannot meet this burden. When terminating correctional officers, "violation of a single rule may constitute a sufficient basis for discharge." *Cruz v. Cook Cnty. Sheriff's Merit Bd.*, 394 Ill. App. 3d 337, 341-342 (2009). A court should not "second-guess[ ] an employer's facially legitimate business decisions. . . An employer's reasons for firing an employee can be 'foolish or trivial or even baseless,' as long as they are 'honestly believed.'" *Milliman*, 893 F.3d at 431 (citations omitted).

The CCSO also pursued Swintek's termination for misconduct related to the injury that he claimed to have sustained around the same time that he learned that he was subject of a OPR investigation. (SUF 59, 60, 63). The Merit Board found that Swintek violated CCSO policy by failing to provide a release of medical records.

Even assuming, *arguendo*, that some of the bigoted statements Switek posted in the Ivan Stalin account could be protected speech under the First Amendment, the additional policy violation regarding Swintek's refusal to execute a release of medical records following his alleged injury provides independent grounds to justify Swintek's termination. Swintek cannot establish the but-for causation that his protected speech was the sole cause of his termination because he would have been fired for conduct unbecoming of a CCSO officer related to his alleged injury and refusal to turn over his medical records. See *Milliman v. Cnty. of McHenry*, 893 F.3d 422, 434 (7th Cir. 2018) ("Because Milliman would have been fired based on his fitness-for-duty examination even absent the protected speech, he cannot establish the requisite 'causal connection between unconstitutional motive and resulting harm.'"). Thus, the Court should grant Defendants' motion for summary judgment.

## <u>CONCLUSION</u>

For the reasons set forth above, Defendants respectfully request that the Court grant summary judgment in their favor on all of Plaintiff's claims.

Dated: October 13, 2023                                Respectfully submitted,


                                                       */s/ Michael A. Carlin*
                                                       Michael A. Carlin

Michael A. Carlin
ZUBER LAWLER LLP
111 W. Jackson Blvd., Ste 1700
Chicago, IL 60603
312-346-1100
mcarlin@zuberlawler.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2023, a copy of the foregoing was served on counsel of record by electronic means pursuant to the court's Electronic Case Filing (ECF) system.

_/s/ Michael A. Carlin_
Michael A. Carlin